## APPEAL OF KELLER MECHANICAL ENGINEERING CORPORATION.

Docket No. 6741.   Promulgated April 25, 1927.

DEPRECIATION.—March 1, 1913, value of two patents determined for the purpose of computing depreciation.

*Laurence A. Tanzer, Esq.,* and *James C. Peacock, Esq.,* for the petitioner.
*Ellis W. Manning, Esq.,* for the Commissioner.

This is an appeal from a determination of a deficiency in income tax for the calendar year 1920 in the amount of $681.91, growing out of the disallowance by the Commissioner of any deduction for the exhaustion of the March 1, 1913, value of two certain patents numbered 877,436, issued January 21, 1908, and 956,769, issued March 30, 1910.

### FINDINGS OF FACT.

The petitioner is a corporation organized under the laws of the State of New York, having its principal place of business in the Borough of Brooklyn in that State. It is the successor in interest, through a merger consummated in 1923, of the Keller Mechanical Engraving Co., also a New York corporation, which in 1904 succeeded and took over a business formerly conducted by a partnership known as the Keller Mechanical Engraving Co.

The petitioner and its predecessor corporation and prior partnership are, and have been since 1896, engaged in the business of manu-

facturing and selling dies and die-sinking and mold-cutting machines and stamped and perforated metal work and similar articles, and the business from the beginning has been based chiefly upon certain patents, principally for machines to cut dies automatically.

At the inception of its business in 1896, it acquired by purchase what was then known as the "Campi" patent, which covered a certain die-cutting machine. This machine was known as a reducing machine.

In 1904 the Keller Mechanical Engraving Co. was incorporated and acquired the assets of the business including the patents covering the reducing machine referred to above. It issued $251,650 par value of its capital stock for intangibles, consisting principally of the said patents.

For a number of years the petitioner manufactured and sold reducing machines and dies made by the reducing process. Its officers became acquainted with the field of die-using industries. This field is a broad one. It includes, among others, automotive industries, locomotive and car works and railroad shops, drop forgers, navy yards, small arms factories, Government arsenals, mints, builders, malleable steel foundries, and rubber factories; also manufacturers of hand tools, cutlery, scissors, manicure goods, surgical instruments, marine hardware, harvester machinery, saddlery and harness hardware, silverware and novelties, medals, badges and jewelry, lighting fixtures, cabinet and trunk hardware, plumbing supplies, glassware, molded and pressed compositions, dolls, electrical parts and insulating materials.

The experience of the business developed the fact that only a small part of the demand of the die-using industries for die-making machinery could be met by the reducing machine. The reducing machine was useful for ornamental work and for other kinds of fine work to which the reducing process was most appropriate. In the case however of the larger number, constituting also the more important part of the die-using industries, including, among others, the industries using drop forgings, the reducing machine was either impractical or unduly expensive, requiring as it did the use of a master three or four times the size of the finished die, with the necessity of a correspondingly large machine and of powerful cutting tools. In these industries there existed during the entire period of the petitioner's experience, a demand for a machine which would cut dies from a master die of the same size—herein referred to as a duplicating machine as distinguished from a reducing machine, which works from a larger master die.

At the time when the petitioner entered the field, no practical duplicating machine capable of handling the work of the industries

referred to had been placed on the market. It was known that such a machine, if it could be developed and marketed, would effect a great saving in the die-using industries over the cost of cutting dies by hand labor, the process then employed. It was also known that there were among the die-using industries a number of strong and powerful concerns which would require duplicating machines, if developed, and which could afford to and would pay for such duplicating machines a price yielding a substantial profit in excess of the profits which the petitioner had been able to realize on the reducing machines.

Among the assets acquired by the Keller Mechanical Engraving Co. at the time of its incorporation in 1904, was an invention for a duplicating machine. The petitioner proceeded to develop this invention to the point of obtaining patents thereon. Two patents were issued for this invention—No. 877,436, issued January 21, 1908, for a belt-driven duplicating machine, and No. 956,769, issued March 30, 1910, for a motor-driven duplicating machine. After obtaining the patents the petitioner addressed itself to the task of designing and developing a type of machine under these patents which could be effectively marketed and used. After experimenting for some time, petitioner succeeded in 1912 in developing and constructing a duplicating machine which met the requirements of the trade. This machine had been developed and was ready to be placed on the market prior to March 1, 1913, and met with success. The so-called duplicating machines constructed under the patents of January 21, 1908, and March 30, 1910, after a period of experimentation, on March 1, 1913, had been actually developed and constructed and were ready to be put on the market. In the light of the petitioner's experience of 17 years with the reducing machine, the known conditions in the die-using industries, and the demand existing in those industries for a duplicating machine, it was clear on and before March 1, 1913, that the duplicating machine patents could cover a field larger than that theretofore served by the reducing machines, and at a profit greater than that theretofore realized from the reducing machines, and that the petitioner could on March 1, 1913, have reasonably anticipated profits arising from the sale and use of the duplicating machines largely in excess of the profits theretofore derived from the sale and use of the reducing machines.

During the period from July 1, 1913, to December 31, 1922, the petitioner had employed in its business net tangible assets and produced net earnings as follows:

| Year ended— | Adjusted earnings. | Net tangible assets at beginning of period. |
|---|---|---|
| June 30, 1914 | $2, 540. 56 | $127, 670. 44 |
| 1915 | 1, 914. 66 | 128, 426. 13 |
| 1916 | } 235, 408. 41 | 127, 467. 25 |
| Dec. 31, 1916 [1] | | { 247, 575. 37 |
| 1917 | 109, 657. 77 | 205, 335. 35 |
| 1918 | 58, 346. 98 | 401, 100. 77 |
| 1919 | 69, 467. 67 | 418, 992. 64 |
| 1920 | 57, 027. 25 | 458, 339. 97 |
| 1921 | [2] 3, 217. 81 | 451, 158. 80 |
| 1922 | 100, 230. 60 | 430, 024. 71 |
| Total | 631, 376. 09 | 2, 996, 091. 43 |
| Average | 66, 460. 64 | 299, 609. 14 |

[1] Six months.    [2] Loss.

During the two fiscal years ended June 30, 1914 and 1915, the 18-month period ended December 31, 1916, and the calendar years 1917 to 1922, inclusive, petitioner made sales of duplicating machines, reducing machines, special machines, dies made on duplicating machines, and other items (miscellaneous and gallery), in the following amounts:

| Year. | Duplicating machines. | | Reducing machines. | | Special machines. | |
|---|---|---|---|---|---|---|
| | Quantity. | Amount. | Quantity. | Amount. | Quantity. | Amount. |
| Fiscal, 1914 | 2 | $5, 810. 00 | 2 | $5, 325. 24 | | |
| 1915 | 1 | 1, 960. 00 | | | | |
| 18 months to Dec. 31, 1916 | 122 | 431, 561. 87 | 3 | 8, 035. 00 | 1 | $4, 000. 00 |
| Calendar, 1917 | 76 | 253, 506. 78 | 2 | 2, 592. 60 | (Credit) | 75. 00 |
| 1918 | 30 | 116, 177. 96 | | | 2 | 8, 076. 07 |
| 1919 | 45 | 223, 868. 63 | 4 | 16, 262. 50 | 4 | 14, 450. 63 |
| 1920 | 41 | 231, 552. 27 | 4 | 14, 231. 48 | 2 | 12, 010. 00 |
| 1921 | 14 | 140. 479. 32 | 1 | 4, 456. 75 | 2 | 25, 426. 35 |
| 1922 | 37 | 304, 232. 04 | 2 | 9, 225. 00 | | |
| Total | 368 | 1, 709, 148. 87 | 18 | 60, 128. 57 | 11 | 63, 888. 05 |
| Percentage of total machine sales | | 93. 2347 | | 3. 2801 | | 3. 4852 |
| Percentage of aggregate sales | | 55. 7188 | | 1. 9602 | | 2. 0828 |

| Year. | Accessories. | Dies manufactured on duplicating machines. | Miscellaneous and gallery. |
|---|---|---|---|
| Fiscal, 1914 | $395. 00 | | $54, 682. 68 |
| 1915 | 162. 08 | $4, 865. 56 | 67, 006. 78 |
| 18 months to Dec. 31, 1916 | 16, 333. 48 | 204, 381. 48 | 61, 190. 38 |
| Calendar, 1917 | 16, 737. 69 | 81, 630. 47 | 55, 057. 30 |
| 1918 | 18, 586. 64 | 79, 784. 69 | 64, 969. 56 |
| 1919 | 15, 411. 49 | 44, 477. 78 | 54, 882. 95 |
| 1920 | 32, 659. 89 | 41, 528. 17 | 98, 270. 68 |
| 1921 | 4, 861. 54 | 22, 475. 63 | 62, 452. 77 |
| 1922 | 26, 045. 46 | 35, 218. 27 | 70, 221. 48 |
| Total | 131, 193. 27 | 514, 362. 05 | 588, 734. 58 |
| Percentage of total dies, and miscellaneous and gallery sales | | 46. 6289 | 53. 3711 |
| Percentage of aggregate sales | 4. 2769 | 16. 7633 | 19. 1930 |

*Gross Sales.*

| | |
|---|---|
| Fiscal year 1914_____ | $66, 212. 92 |
| 1915_____ | 73, 994. 42 |
| 18 months to Dec. 31, 1916_____ | 725, 502. 21 |
| Calendar year 1917 _____ | 409, 449. 84 |
| 1918 _____ | 287, 594. 92 |
| 1919 _____ | 369, 353. 98 |
| 1920 _____ | 430, 252. 49 |
| 1921 _____ | 260, 152. 38 |
| 1922 _____ | 444, 942. 25 |
| Total_____ | 3, 067, 455. 41 |

The accessories sold as shown above were special fixtures such as mills, cutters, and tractors, for use with the three types of machines in special work. They could not be used on any other than the machines manufactured by the petitioner. During the nine and one-half years from July 1, 1913, to December 31, 1922, all sales of accessories, except those sold with machines and billed to customers on the same invoice with machines, were carried in one account in the petitioner's books. Sales of accessories made in connection with sales of machines, and billed on the same invoices with machines, were carried in the machines sales account. It is therefore impractical to accurately classify the accessories sales according to the three types of machines to which they were adapted in order to determine what part of those sales were sales of accessories for use in connection with duplicating machines only.

No duplicating machines had been set up in petitioner's plant, for the purpose of manufacturing dies, prior to the fiscal year 1915.

The gross profits for the years 1917 to 1922, inclusive, from sales of machines and accessories, and dies manufactured on duplicating machines, and from gallery and miscellaneous sales, were as follows:

| Year. | Machines and accessories. | Dies | Gallery. | Miscellaneous. | Total. |
|---|---|---|---|---|---|
| 1917_____ | $131, 069. 00 | $41, 505. 23 | $223. 99 | $669. 11 | $173, 019. 35 |
| 1918_____ | 58, 333. 63 | 46, 251. 54 | 1, 003. 30 | 1, 899. 57 | 107, 488. 04 |
| 1919_____ | 110, 511. 30 | 19, 289. 12 | 1, 317. 29 | 952. 28 | 132, 069. 99 |
| 1920_____ | 123, 553. 63 | 34, 831. 74 | 1, 539. 92 | 3, 899. 05 | 163, 824. 34 |
| 1921_____ | 70, 945. 62 | 15, 887. 82 | _____ | 993. 58 | 87, 827. 02 |
| 1922_____ | 161, 728. 74 | 22, 078. 38 | _____ | 3, 471. 83 | 187, 278. 95 |
| Total_____ | 656, 141. 92 | 179, 843. 83 | 3, 636. 52 | 11, 885. 42 | 851, 507. 69 |
| Percentage_____ | 77. 05649 | 21. 12063 | . 42707 | 1. 39581 | 100. 00 |

Prior to the year 1917 petitioner's books of account were not maintained in such a manner that the gross profits from sales can be determined separately for the four classifications shown above. In 1917 a cost accounting system was installed, making possible the ascertainment of the profits on the four classifications separately, from 1917 to 1922, inclusive.

The profit on each duplicating machine during the years 1917 to 1922, inclusive, was as great as the profit on each reducing and each special machine for the same period.

In auditing the petitioner's income-tax return for the year 1920, the Commissioner refused to allow a deduction for exhaustion of the patents covering the duplicating machine.

The fair value of the two patents in question on March 1, 1913, was $218,000.

### OPINION.

GREEN: Specifically, the issue on appeal is the March 1, 1913, value of United States letters patent Nos. 877,436 and 956,769, issued under dates of January 21, 1908, and March 30, 1910, respectively, and owned by the petitioner on the basic date, covering a belt-driven duplicating machine and a motor-driven duplicating machine, and the deduction to which the petitioner is entitled under the provisions of section 234 (a) (7) of the Revenue Act of 1918 for exhaustion of these patents. The petitioner claims a fair market value for these patents at March 1, 1913, of $300,000, and a deduction for exhaustion in the amount of $23,061.54, based upon the claimed value. The Commissioner denies that these patents had a fair market value at March 1, 1913, which may be made the subject of an allowance for exhaustion over the remaining life thereof.

The issue raised by this appeal is identical with the one which came before the Board in an appeal by this petitioner, Docket No. 2087, relating to the years 1918 and 1919, which is reported in 1 B. T. A. 1183. By stipulation of the parties, all of the evidence, documentary and oral, which was had in the trial of the earlier appeal, was placed in evidence for the purposes of the present appeal. Such new evidence as was adduced may be said to be confined to the deposition, with accompanying exhibits, of Edward N. Anderson, petitioner's auditor and office manager, relating to the sales and earnings, which are set out in tabulated form in the findings of fact, and the accounts carried on petitioner's books.

After a careful consideration of the evidence, we can not escape the conclusion which the Board reached in its opinion in the earlier appeal—that the two patents in question, immediately upon their issue and on March 1, 1913, had a very considerable capital value. For 17 years prior to March 1, 1913, the petitioner had been engaged in manufacturing dies, die-sinking and mold-cutting machines, and stamped and perforated work. It had also manufactured and sold reducing machines and dies made by the reducing process, which constituted a chief part of its operations. Its officers were intimately acquainted with the die-using industries and their particular needs.

Among others, the die-using industries included automobile manufacturers, locomotive and car works, railroad shops, drop forgers, navy yards, munitions factories, Government arsenals, mints, malleable steel foundries, rubber manufacturers, and manufacturers of miscellaneous cutlery, surgical instruments, marine hardware, harvester machinery, jewelry, plumbing supplies, toys, electrical parts and insulating materials. Experience had taught the petitioner that only a small part of the demands of the die-using industries could be met by the reducing machine. The latter was particularly appropriate and useful for ornamental and other kinds of fine work, but in the case of the greater number and more important of the die-using industries the reducing machine was not adaptable to their needs. The petitioner knew that the demand of the latter industries was for a machine which would cut dies from a master of the same size. The principle involved in the reducing machine was the cutting from a m ster three to four times the size of the die desired. This machine was too large, expensive, and necessitated the use of powerful cutting tools.

It was with visions of supplying the needs of the greater number and more important of the die-using industries that the petitioner, prior to 1908, undertook to perfect and construct a machine which would cut dies from a master of the same size. By 1908 it had succeeded in perfecting such a machine, a so-called duplicating machine, to the point where it was enabled to secure a patent. This was a belt-driven machine. In 1910 it secured a patent on a motor-driven machine. Four or five of these machines were manufactured and sold prior to 1913, but little had been done toward marketing them prior to that year, as the petitioner desired to make certain improvements before offering them as a completed and perfected machine.

At March 1, 1913, the petitioner was ready to manufacture and furnish the perfected duplicating machine to the die-using industries. The sales of duplicating machines from the basic date on to 1922 are set out in the findings of fact.

The inability of the Board to reach a conclusion as to the March 1, 1913, value of these patents in its opinion in the earlier appeal was due to the deficiency in the evidence as to the earnings which could fairly be allocated to the duplicating machines covered by these patents. Though it submitted evidence as to the earnings of the period July 1, 1913, to December 31, 1922, the petitioner failed to show a proper segregation of these earnings as between the three types of machines sold. This situation does not exist in the present appeal. The facts relating to sales and profits set out in the findings of fact make possible a fair and equitable segregation of the earnings, and when considered together with all the other evidence, enable us to

reach a conclusion as to the fair market value of the patents in question at March 1, 1913.

The use of subsequent earnings for the determination of an asset value, at any basic date, is justified, if from past experience and facts definitely known at the time, such earnings might reasonably have been anticipated. *Appeal of J. J. Gray, Jr.*, 2 B. T. A. 672. Considering the circumstances which existed at March 1, 1913, as we have previously outlined them, we think the petitioner was in a most favorable position to anticipate the future earnings of these patents; and, therefore, the earnings subsequent to the basic date may be considered in reaching a conclusion as to the value of the patents.

After a careful consideration of all the evidence before us, we have reached the conclusion that the fair value of the two patents in question at March 1, 1913, was $218,000.

At March 1, 1913, patent No. 877,436 had a remaining life of 11 years 10 months and 20 days, and patent No. 956,769 had a remaining life of 14 years 1 month and 1 day. The average remaining life of the two patents at March 1, 1913, was 12 years 11 months and 25 days. The petitioner is entitled to a deduction for the year under consideration, on account of exhaustion of the March 1, 1913, value of its patents, in the sum of $16,787.17.

*Judgment will be entered on 15 days' notice, in accordance with Rule 50.*